1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                             DISTRICT OF NEVADA

8                                   * * *

9

10   UNITED STATES OF AMERICA,        )
                                      )
11          Plaintiff,                )          2:08-cr-00061-PMP-RJJ
                                      )
12   vs.                              )          REPORT &   RECOMMENDATION
                                      )            OF UNITED STATES
13                                    )            MAGISTRATE JUDGE
                                      )          (Defendant's Motion to Suppress #29)
14   MARQUE GARDELEY,                 )
                                      )
15          Defendant.                )

16          This matter came before the court for a hearing on Defendant Marque Gardeley's Motion to

17   Suppress (#29).  The Court has considered Defendant's Motion (#29); the Government's Response

18   (#35); and the testimony and evidence presented during the evidentiary hearing.

19                                **BACKGROUND**

20          On March 12, 2008, Defendant Marque Gardeley was indicted and charged with being a felon

21   unlawfully in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The

22   Government also seeks the forfeiture of certain property from Gardeley pursuant to 18 U.S.C. §§

23   922(g)(1), 924(a)(2), and 924(d), as well as 28 U.S.C. § 2461© and 21 U.S.C. § 853.

24          On March 14, 2007, at approximately 6:00 a.m., the Las Vegas Metropolitan Police

25   Department received a 911 call.  The caller reported (1) that she witnessed a black male point a

26   sawed-off shotgun at an individual in a Walmart parking lot located near the intersection of

27   Tropicana Avenue and Fort Apache Road in Las Vegas, NV; (2) that the alleged assailant got into

28   a white four-door Ford Focus with a black, female passenger; and (3) that the Ford Focus had

1   temporary tags but no license plates.  The caller also provided a detailed description of the route

2   taken by the Ford Focus after it left the Walmart parking lot.  The caller identified herself as

3   "Stacey" and described her own vehicle as a blue Nissan.  When asked to provide her contact

4   information, the caller stated that she preferred not to give that information out.  When the dispatcher

5   attempted to connect the caller with an officer, the caller hung up.

6         The information provided by the 911 caller was broadcast over the police radio.  Officer

7   William Nichol heard the report and headed westbound on Tropicana Avenue.  He was passed by

8   a white Ford Focus heading eastbound which was occupied by two individuals matching the

9   description sent out over the police radio.  Officer Nichol turned around, activated his overhead

10  lights and siren, and initiated a "felony car stop."  The suspect vehicle pulled onto the eastbound

11  facing shoulder of Tropicana Avenue.

12        After the suspect vehicle pulled over, Officer Nichol and his partner, Officer Ramirez,

13  positioned their patrol cars in a staggered formation behind the suspect vehicle.  Within moments,

14  two more patrol cars arrived on the scene.  As a result of the staggered formation of the patrol cars,

15  all lanes of eastbound traffic on Tropicana Avenue were blocked.  Each patrol car had its side

16  spotlight activated and pointed toward the suspect vehicle.  All of the officers were out of their

17  vehicles with their guns drawn.

18        After the patrol cars and officers were in position, Officer Nichol shouted instructions to the

19  occupants of the vehicle.  He instructed the driver, identified as Defendant Gardeley, to show his

20  hands and throw the keys out the window.  Gardeley stepped out of the vehicle and began shouting

21  back to the officers that he was deaf.  Officer Nichol told Gardeley to turn around and face away

22  from the officers.  During this exchange, Officer Dudley, another officer on the scene, "racked" his

23  shotgun.  Officer Dudley testified that Gardeley responded to the sound of the shotgun being

24  "racked" with a whimper and went to the ground.  The passenger also exited the vehicle.

25        After Gardeley and the passenger exited the vehicle, the officers approached the suspects and

26  handcuffed them.  Officer Nichol gave Gardeley the *Miranda* warnings.  Gardeley, pointing to his

27  ears, informed Officer Nichol that he was deaf.  Upon learning that Gardeley was deaf, Officer

28  Nichol, reading from a department issued card, informed Gardeley that he had the right to a qualified

1  sign language interpreter before making any statements or answering any questions. Officer Nichol

2  also allowed Gardeley to read the card. Gardeley indicated that he understood.

3  As Officer Nichol spoke with Gardeley, other officers, including Officer Dudley, approached

4  the suspect vehicle to ensure that there was no one else inside it. Officer Dudley testified that as he

5  approached the vehicle he looked through the window and saw a sawed-off shotgun in the backseat.

6  When asked about the shotgun, Gardeley told police that as he was leaving Walmart an individual

7  approached him, pointed the shotgun at him, and tried to steal his groceries. Gardeley claimed that

8  he pulled the gun away from the individual trying to rob him and drove off. During the course of the

9  stop, the police learned that the vehicle Gardeley was driving had been reported stolen. Police also

10  recovered materials commonly used to steal cars in a subsequent search of the vehicle.

11  By way of this motion, Gardeley argues that the stop violated his Fourth Amendment rights

12  because the 911 call was insufficient to establish reasonable suspicion to conduct a stop and,

13  therefore, all evidence obtained as a result of the stop must be suppressed.[1] The Government argues

14  that the request should be denied because Gardeley does not have standing to challenge the search

15  of the vehicle. The Government also argues that, even assuming standing, the evidence is admissible

16  under certain exceptions to the general search warrant requirement.

**DISCUSSION**

17

18  **1. Standing**

19  As a threshold issue, the Government argues that Gardeley does not have standing to

20  challenge the search of the vehicle because he has no lawful ownership or possessory interest in the

21  vehicle. "[T]he proponent of a motion to suppress has the burden of establishing that his own Fourth

22  Amendment rights were violated by the challenged search or seizure." *Rakas v. United States*, 439

23  U.S. 128, 131 n. 1 (1978). "To invoke Fourth Amendment protections, a person must show that he

24  had a legitimate expectation of privacy." *United States v. Shryock*, 342 F.3d 948, 978 (9th Cir. 2003)

25  (citation omitted). To establish a legitimate expectation of privacy a person must show (1) a

26  subjective expectation of privacy (2) that society is prepared to recognize as objectively reasonable.

27

28  [1] Gardeley also raised a *Miranda* issue in his moving papers; however, that issue was withdrawn during the evidentiary hearing.

1    *United States v. Cayment*, 404 F.3d 1196, 1199 (9th Cir. 2005).

2           A person does not possess a reasonable expectation of privacy in a vehicle in which he has

3    no lawful ownership or possessory interest. *United States v. Thomas*, 447 F.3d 1191, 1197 (9th Cir.

4    2006).   To establish lawful possession, a defendant must show "joint control" or "common

5    authority" over the property searched.   *Thomas*, 447 F.3d at 1198.   Gardeley does not own the

6    vehicle, nor has he established that he was in lawful possession of the vehicle.   Although Gardeley

7    claims he was given permission by a friend to use the vehicle, he has failed to show that the friend

8    had authority to give that permission.   There is nothing in the record indicating that Gardeley's friend

9    owned the vehicle or was in lawful possession of the vehicle prior to giving Gardeley permission to

10   use it.   Indeed, the record shows that Gardeley's friend matches the description of the person

11   suspected of stealing the vehicle from a rental agency.   Thus, to the extent Gardeley is challenging

12   the search of the vehicle, he has not carried his burden to show that he has standing to do so.

13          However, it appears that Gardeley's Fourth Amendment challenge is aimed at the stop, not

14   the search, of the vehicle.   Occupants of a vehicle have standing to challenge the stop of the vehicle

15   even if they have no possessory or ownership interest in the vehicle.   *United States v. Colin*, 314 F.3d

16   439, 442-43 (9th Cir. 2002) (finding that both the driver and passenger of a vehicle had Fourth

17   Amendment standing to challenge the stop of a vehicle the police suspected was stolen); *United*

18   *States v. Pulliam*, 405 F.3d 782, 787 (9th Cir. 2005) (citing *United States v. DeLuca*, 269 F.3d 1128,

19   1132 (10th Cir. 2001) for the proposition that "[a]lthough a defendant may lack the requisite

20   possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the

21   defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence

22   found in the vehicle as the fruit of the [defendant's] illegal detention."); *United States v. Twilley*, 222

23   F.3d 1092 (9th Cir. 2000) (finding that the defendant could challenge the stop of the vehicle on

24   Fourth Amendment grounds even with no possessory or ownership interest in the vehicle).   Thus,

25   although Gardeley does not have standing to challenge the search directly, he has standing to argue

26   that the initial stop violated the Fourth Amendment, and that the evidence seized as a result of the

27   stop is subject to suppression.   *Twilley*, 222 F.3d at 1095.

28   . . . .

1      **2. Traffic Stop**

2          The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST.

3   AMEND. IV.  A traffic stop is a seizure within the meaning of the Fourth Amendment. *United States*

4   *v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000) (*citing Delaware v. Prouse*, 440 U.S. 648, 653

5   (1979)); *see also Whren v. United States*, 517 U.S. 806, 809-10 (1996).   Police  may conduct

6   investigative traffic stops only if the stop is supported by reasonable suspicion.   *United States v.*

7   *Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000).  Police  have reasonable suspicion when there are

8   specific, articulable facts which, when taken together with objective and reasonable inferences, form

9   the basis for the suspicion that a particular person is engaged in criminal conduct. *Thomas*, 211 F.3d

10  at 1189 (9th Cir. 2000) (citing *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir.

11  1989)).   Whether there is reasonable suspicion is determined by looking at the totality of the

12  circumstances. *Alabama v. White*, 496 U.S. 325, 330 (1990).  This case involves a traffic stop where

13  the police acted solely on information provided by a 911 caller.  A 911 call must exhibit sufficient

14  "indicia of reliability" in order to provide the reasonable suspicion necessary to justify a traffic stop.

15  *United States v. Terry-Crespo*, 356 F.3d 1170, 1173 (9th Cir. 2004).

16          Citing *Florida v. J.L.*, 529 U.S. 266 (2000), Gardeley argues that the 911 call was not

17  sufficiently reliable because the caller did not provide detailed identifying information, refused to

18  provide a call-back number, and refused to speak with an officer.  According to Gardeley, this

19  presented an issue of anonymity requiring the police to corroborate the information before

20  conducting the stop.  In *J.L.*, the Supreme Court assessed the reliability of an anonymous phone tip.

21  The tip was not recorded or otherwise documented, the police knew nothing about the anonymous

22  informant, and the tip was not received via a 911 call. *Terry-Crespo*, 356 F.3d at 1174 (citing *J.L.*,

23  529 U.S. at 268). The court held that the tip was insufficient to provide reasonable suspicion

24  justifying an investigative stop because it was nothing more than a "bare report of an unaccountable

25  informant." *J.L.*, 529 U.S. at 268.  In *Terry-Crespo*, the Ninth Circuit distinguished *J.L.* and

26  identified several factors a court should consider when determining whether a 911 call exhibits

27  sufficient indicia of reliability, including: (1) whether the call is truly anonymous; (2) whether the

28  911 call is contemporaneous with emergency events; (3) whether the 911 caller is a victim of the

- 5 -

1    criminal activity being reported; and (4) the timing of the 911 call in relation to the activity reported.

2

3         First, although "'a tip may be anonymous in some sense,' it may have 'certain other features,

4    either supporting reliability or narrowing the likely class of informants, so that the tip does provide

5    the lawful basis for some police action.'" *Terry-Crespo*, 356 F.3d at 1174 (citing *Florida v. J.L*, 529

6    U.S. 266, 275 (2000) (Kennedy, J, concurring)).  In *Terry-Crespo*, the 911 caller identified himself

7    with his first and last name but did not provide a phone number or any other identifying information.

8    Even with this limited information, and despite being unable to locate the caller afterward, the court

9    found that the call sufficiently narrowed the class of likely informants.  356 F.3d at 1174.  The court

10   declined to impose a duty on the police to confirm the identity of every 911 caller.  *Terry-Crespo*,

11   356 F.3d at 1175.

12        Recently, in *United States v. Chacon*, 2009 WL 1520007 (D. Nev.), the court was faced with

13   similar circumstances.  In *Chacon*, an individual called 911 to report that "he had just seen 'a guy

14   put a woman in the trunk of a Cadillac.'" *Chacon*, 2009 WL 1520007 *7.  The 911 caller also gave

15   a detailed description of the route being traveled by the Cadillac.  The 911 caller provided his first

16   name, his telephone number, and a description of the vehicle he was driving.  The court determined

17   that this was sufficient to alleviate any concerns about anonymity.

18        Here, the caller provided her first name, a description of her own vehicle, but declined to

19   provide her telephone number.  The failure to provide a telephone number does "not diminish the

20   risk of losing any anonymity." *Terry-Crespo*, 356 F.3d at 1176.  Merely calling 911 and having a

21   recorded telephone conversation risks the possibility that the police could trace the call or identify

22   the caller by voice.  *Terry-Crespo*, 356 F.3d at 1176.  In addition to providing her first name and a

23   description of her vehicle, the caller remained on the line for approximately ten minutes and had a

24   detailed conversation with the 911 operator.  By making the 911 call and remaining on the line for

25   such a long period of time, the caller risked any anonymity she might have enjoyed and exposed

26   herself to legal sanction for filing a false report.  *Cf. Terry-Crespo*, 356 F.3d at 1176.  Further, the

27   911 call in this case was introduced into evidence eliminating any chance for "after-the-fact, police

28   fabrication of an anonymous informant." *Terry-Crespo*, 356 F.3d at 1175.  The Court is satisfied

1  that the caller provided sufficient information to alleviate any concerns about anonymity.

2      Second, this 911 call was entitled to greater reliability because it was contemporaneous with

3  emergency events.   As a general matter, 911 calls are entitled to greater reliability than tips

4  concerning general criminality "because the police must take 911 emergency calls seriously and

5  respond with dispatch." *Terry-Crespo*, 356 F.3d at 1176 (citing *United States v. Holloway*, 290 F.3d

6  1331 (11th Cir. 2002), *cert. denied*, 537 U.S. 1161 (2003)).   Calls to 911 often involve exigent

7  situations which limit law enforcement's ability to gather identifying information.  Indeed, "[p]olice

8  delay while attempting to verify an identity or seek corroboration of a reported emergency may prove

9  costly to public safety and undermine the 911 system's usefulness." *Terry-Crespo*, 356 F.3d at 1176.

10     In this case, the 911 caller reported that she had witnessed a man point a sawed-off shotgun

11  at another person in a Walmart parking lot.   The caller described the firearm, the alleged assailant,

12  and the vehicle used by the alleged assailant to flee the scene.  Certainly the police need to respond

13  to reports of an individual pointing a firearm at another in a shopping center parking lot.   "The

14  Fourth Amendment does not require the police to conduct further pre-response verification of a 911

15  caller's identity where the caller reports an emergency." *Terry-Crespo*, 356 F.3d at 1176.

16     Third, the police may place additional reliability on "first hand information from a crime

17  victim laboring under the stress of recent excitement." *Terry-Crespo*, 356 F.3d at 1176.  Gardeley

18  attempts to distinguish *Terry-Crespo* on the ground that it involved a 911 call from the victim of the

19  crime that was reported.  There is nothing in the record suggesting that the 911 caller in this case was

20  the victim of the activity she was reporting.  Nevertheless, another factor the court considers is the

21  timing of the call in relation to the activity being reported.  In *Terry-Crespo*, the court cited *United*

22  *States v. Valentine*, 232 F.3d 350 (3d Cir. 2000) for the proposition that the police may give "greater

23  reliability to a tip, even an anonymous one, where an informant [is] reporting what he observed

24  moments ago, not stale or second-hand information." *Terry-Crespo*, 356 F.3d at 1177.  Here, the

25  caller was reporting activity that she had just observed.  Given the proximity of the call to the

26  activity, the police were entitled to place additional reliability on the tip.

27     Finally, Gardeley argues that the 911 caller gave dispatch false information thereby

28  undermining her credibility and necessitating further police corroboration.  Gardeley claims that the

1    caller lied when she said she was not following the vehicle.  Although the caller said she was not

2    following the vehicle, she conceded that she was traveling the same route as the vehicle.  It is

3    certainly plausible that an individual can be traveling the same route as another without "following"

4    that individual.  Gardeley also claims that the caller lied when she said that she was still in the

5    Walmart parking lot.  Even assuming Gardeley's claim, the Court does not believe this undermined

6    the caller's credibility to such an extent that the police were required to ignore all other indicators

7    of reliability.

8         Based on the foregoing, the Court finds that the 911 call in this case exhibited sufficient

9    "indicia of reliability" to justify the stop.  The call was at least as reliable as the call in *Terry-Crespo*.

10   The call was recorded and presented during the evidentiary hearing.  The caller provided her first

11   name and a description of her vehicle–narrowing the likely class of informants.  The caller remained

12   on the line for an extended period of time risking any anonymity.  The caller reported first-hand

13   observations of an emergency situation within moments after the events occurred.  The caller

14   provided a detailed description of the route being driven by the suspect.  The call has the necessary

15   indications of reliability to justify the stop in this matter.  Thus, the evidence obtained as a result of

16   the stop is not subject to suppression.

17                                              **RECOMMENDATION**

18        Based on the foregoing and good cause appearing therefore,

19        IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the

20   Defendant's Motion to Suppress (#29) be **DENIED**.

21                                                    **NOTICE**

22        Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must**

23   **be in writing and filed with the Clerk of the Court on or before May 25, 2010.**  The Supreme

24   Court has held that the courts of appeal may determine that an appeal has been waived due to the

25   failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This

26   circuit has also held that (1) failure to file objections within the specified time and (2) failure to

27   properly address and brief the objectionable issues waives the right to appeal the District Court's

28   order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst*, 951 F.2d

1  1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

2      DATED this __11th__ day of May, 2010.

ROBERT J. JOHNSTON
United States Magistrate Judge